J-S13024-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GERALD SMITH | |
| Appellant | No. 2660 EDA 2015 |

Appeal from the Judgment of Sentence March 4, 2008
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0312371-2006

BEFORE:  BENDER, P.J.E., LAZARUS, J., and FITZGERALD, J.[*]

MEMORANDUM BY LAZARUS, J.:                **FILED APRIL 13, 2017**

Gerald Smith appeals *nunc pro tunc* from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following his conviction for third-degree murder,[1] possessing an instrument of crime (PIC),[2] and recklessly endangering another person (REAP).[3]  Upon review, we affirm on the basis of the opinion authored by the Honorable Steven R. Geroff.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S. § 907.

[3] 18 Pa.C.S. § 2705.

The trial court summarized the relevant facts and procedural history of this matter as follows:

On November 26, 2007, following a jury trial before Judge Carolyn Engel Temin, [(now retired)], [Smith] was found guilty of murder of the third degree, [PIC], and [REAP]. On March 4, 2008, [Smith] was sentenced to [9½ to 20] years['] incarceration for the offense of murder of the third degree and a consecutive prison term of [1 to 2] years[' incarceration] for the offense of REAP. No further penalty was imposed on the [PIC] conviction. At trial, [Smith] was represented by Brian McMonagle, Esquire. No direct appeal was filed on [Smith's] behalf.

On February 17, 2009, [Smith] filed a timely pro se petition under the Post[-]Conviction Relief Act ("PCRA"), 42 Pa.C.S. §[§] 9541 et seq., in which he alleged ineffective assistance of his trial counsel for failure to appeal [his] convictions. Attorney James Bruno was subsequently appointed to represent [Smith] in the PCRA proceedings. On February 3, 2011, the trial court gave an instruction to Mr. Bruno to obtain from [Smith] a statement explaining whether he had requested his trial attorney to take an appeal. On or about December 7, 2011, Mr. Bruno filed an affidavit [] on [Smith's] behalf[, which indicated a desire on Smith's part to file an appeal but did not include an indication of a direct request for an appeal].

On December 9, 2011, the court issued [n]otice under [Pa.R.Crim.P.] 907[,] notifying [Smith] of its intention to dismiss his PCRA [p]etition for the reason that the issues he raised in the [p]etition were without merit. On January 23, 2012, the court dismissed [Smith's] [p]etition.

[Smith] timely appealed; however, Mr. Bruno failed to comply with the court's February 23, 2012 order to provide the court with a [c]oncise [s]tatement of [m]atters [c]omplained of on [a]ppeal pursuant to Pennsylvania rule of Appellate Procedure[] 1925(b). In addition, Mr. Bruno neglected to file a brief on [Smith's] behalf; this neglect resulted in the matter being remanded to the PCRA court to determine whether or not counsel had abandoned [Smith]. The appeal was reinstated on July 31, 2012, after counsel belatedly filed the brief. On April 5, 2012, Judge Temin issued an opinion in this matter[, denying

the petition because the affidavit did not aver that Smith requested counsel to file an appeal].

On March 22, 2013, following a temporary suspension from the practice of law, Mr. Bruno requested the Superior Court's permission to withdraw from the case. He also petitioned the Court to have the case remanded to the PCRA court for the appointment of [] new counsel. The petition was granted on April 10, 2013.

Thereafter, Janis Smarro, Esquire, was appointed as [Smith's] new counsel. On May 20, 2013, Attorney Smarro filed an "Application to Vacate Briefing Order and for Remand to Trial Court with Leave to File a Concise Statement of Errors Complained of on Appeal and for the Trial Court's Preparation of a Supplemental Pa.R.A.P. 1925(a) Opinion" on [Smith's] behalf.

On June 7, 2013, the Superior Court granted the Application to Vacate. The Superior Court issued an [o]rder remanding the Application to Vacate and the certified record to the PCRA court for a period of 60 days, permitting [Smith] to file a new Rule 1925(b) statement with the PCRA court and instructing the PCRA court to prepare a supplemental opinion pursuant to Rule 1925(a) within thirty days of the date the 1925(b) statement was received.

On June 11, 2013, [Smith] filed a 1925(b) [c]oncise [s]tatement of [e]rrors [c]omplained of on [a]ppeal. In the 1925(b) [s]tatement, [Smith claimed that his trial counsel was ineffective for failure to protect [his] appellate rights by filing a [n]otice of [a]ppeal as requested by [Smith]. [Smith] argued that he was entitled to post-conviction relief in the form of the grant of leave to file a [n]otice of [a]ppeal *nunc pro tunc*.

On June 18, 2014, Natasha L. Lowe, Trial Division/Appeal Unit Supervisor, sent a letter addressed to Joseph D. Seletyn, Esq[uire], Prothonotary of the Superior Court of Pennsylvania, in which she noted that no supplemental opinion would be filed in this matter because Carolyn E. Temin, the trial judge who presided over this case, was no longer sitting as a [j]udge in Philadelphia County.

On February 9, 2015, the Superior Court issued a decision vacating the PCRA court's order and remanding for an evidentiary hearing. The Superior Court concluded that the PCRA court erred in dismissing [Smith's] PCRA [p]etition without

first conducting an evidentiary hearing; the Superior Court, therefore, relinquished its jurisdiction.

On September 1, 2015, [Smith's] motion to reinstate appellate rights *nunc pro tunc* was heard and granted. On September 2, 2015, [Smith], through his counsel, filed a [n]otice of [a]ppeal *[n]unc [p]ro [t]unc*. On Nobembver 3, 2015, [Smith's] counsel field, *sua sponte*, a [c]oncise [s]tatement of [e]rrors [c]omplained of on [a]ppeal pursuant to Pa.R.A.P. 1925(b).

. . .

The evidence adduced at trial established . . . that on March 11, 2006, [Smith] committed murder of the third degree by firing a bullet into the head of the decedent, Lynette ("Net") Logan, then six month[s'] pregnant with [Smith's] child, at 906 North 41st Street in the City of Philadelphia. The decedent was killed with a .38 caliber Special Magnum five-shot chrome with black rubber grips, which, by [Smith's] own admission, was the weapon from which the fatal shot was fired. The jury also found the evidence to be sufficient to support the guilty verdict on the charges of [PIC] and [REAP].[4]

Trial Court Opinion, 8/22/16, at 1-5 (citations omitted).

On appeal, Smith raises the following questions for our review:

1. Is [Smith] entitled to the grant of a new trial since the trial court erred when it denied his pretrial motion to suppress his statement[s]?

2. Is [Smith] entitled to an arrest of judgment with regard to his convictions for third-degree murder, [REAP] and [PIC,] since the evidence is insufficient to sustain these convictions as the Commonwealth failed to prove [Smith's] guilt of these crimes beyond a reasonable doubt?

_____

[4] The trial court's Rule 1925(a) opinion details the specific testimony of the individuals who testified at trial, which detail we will not recite here. **See** Trial Court Opinion, 8/22/16, at 5-19.

3. Is [Smith] entitled to a new trial as a result of the trial court's ruling that precluded his attempt to introduce evidence concerning the victim's prior suicide attempt?[5]

Brief for Appellant, at 4.

In his first issue, Smith asserts that the trial court erred by denying his motion to suppress statement[s] he made in which he indicated that he fired the .38 caliber gun and caused the victim's death during an attempt to take the gun from her.

In addressing a challenge to the denial of a suppression motion, our review

> is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Hoppert*, 39 A.3d 358, 361 (Pa. Super. 2012) (citation omitted).

Prosecutors may not use statements stemming from the custodial interrogation of a defendant unless procedural safeguards are in place to secure the defendant's privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, voluntary statements are not

---

[5] Smith's claims on appeal have been renumbered for ease of disposition.

barred from admission by **Miranda** in criminal prosecutions. **Commonwealth v. Wiggins**, 371 A.2d 207, 211 (Pa. 1977).

In this matter, at the time Smith first made statements to police, he was being questioned as a witness rather than a suspect. The detective testified that she believed the incident to be a suicide[6] rather than a homicide at that point and conducted her interview of Smith accordingly. Thus, the police did not consider Smith to be in custody and did not read him **Miranda** rights. Smith was not handcuffed or otherwise restrained. Thereafter, when asked if there was anything Smith would like to tell police, he responded affirmatively; he was **Mirandized** and indicated he wished to proceed without an attorney before making incriminating statements. Accordingly, the court's finding that Smith was free to leave is supported by the record. **Hoppert**, **supra**. Moreover, Smith states in his brief that he was **Mirandized** and made voluntary statements afterward. Brief for Appellant, at 17. Judge Geroff's opinion thoroughly analyzes this issue, and we affirm on the basis of his well-reasoned opinion.

Next, Smith argues that the evidence was insufficient to convict him of third-degree murder, PIC, and REAP. In considering sufficiency of the evidence claims,

> we must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in the

---

[6] The victim was in the bathtub, allegedly threatening to commit suicide.

light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. . . . Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail. Of course, the evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part or none of the evidence presented.

*Commonwealth v. Watley*, 81 A.3d 108, 113 (Pa. Super. 2013) (en banc). The Commonwealth can satisfy its burden via wholly circumstantial evidence. *Id.*

"Third[-]degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Commonwealth v. Morris*, 958 A.2d 569, 576 (Pa. Super. 2008); 18 Pa.C.S. § 2502(c). Malice can be shown by "proving that a defendant used a dangerous weapon on a vital part of another's body." *Commonwealth v. Clark*, 411 A.2d 800, 802 (Pa. Super. 1979). A gun is clearly a dangerous weapon, and, here, it is undisputed that the victim died from a gunshot wound to the head. Smith confessed to firing the shot that killed the victim. As noted above, the trial court correctly denied Smith's motion to suppress this evidence. Accordingly, sufficient evidence was presented to convict Smith of third-degree murder. *Watley*, *supra*. Judge Geroff thoroughly analyzes the sufficiency of Smith's conviction, and we rely on his opinion in disposing of this issue.

As to PIC, a person is guilty "if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907. Criminal intent may

be inferred from the circumstances surrounding the possession of the instrument of crime. **Commonwealth v. Andrews**, 768 A.2d 309, 318 (Pa. 2001). Here, according to statements he made to police, Smith possessed a .38 caliber handgun, which killed the victim when it fired while in his possession. Accordingly, the requisite intent can be inferred from the situation, **id.**, and sufficient evidence was presented to convict Smith of PIC. **Watley**, **supra**. Judge Geroff thoroughly analyzes this issue, and we rely on his opinion in disposing of this sufficiency claim.

A person is guilty of REAP if he "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705. Here, Smith and the victim were verbally fighting and Smith introduced a loaded gun into the altercation and ultimately fired it at the victim. Thus, the elements of REAP are satisfied. **See Commonwealth v. Hopkins**, 747 A.2d 910 (Pa. Super. 2000) (brandishing loaded firearm during commission of crime provides sufficient basis for factfinder to conclude that defendant proceeded with conscious disregard for the safety of others had present ability to inflict great bodily harm or death). Accordingly, sufficient evidence was produced to convict Smith of REAP, **Watley**, **supra**, and we rely upon the thorough analysis of Judge Geroff's opinion to affirm Smith's conviction.

Finally, Smith asserts that the trial court erred by refusing to admit evidence of the victim's prior suicide attempt. We note that our standard of review is one of deference, since "[t]he admissibility of evidence is solely

within the discretion of the trial court and will be reversed only if the trial court has abused its discretion." ***Commonwealth v. Herb***, 852 A.2d 356, 363 (Pa. Super. 2004). Instantly, the trial court permitted evidence of the victim's previous suicide attempt to be admitted into the trial, but held that this would open the door to rebuttal evidence regarding the contentious relationship between Smith and the victim that may have affected her state of mind.[7] ***See*** Pa.R.E. 404(a)(2)(B)(i) (evidence of alleged victim's character trait admissible in criminal case; if such evidence admitted, prosecutor may offer rebuttal evidence). Accordingly, we do not find that the court abused its discretion, ***Herb***, ***supra***, and we rely upon Judge Geroff's well-reasoned opinion in this regard.

For the foregoing reasons, we affirm the judgment of sentence on the basis of the opinion of Judge Steven R. Geroff. The parties are instructed to attach a copy of the opinion dated August 22, 2016, in the event of further proceedings in this matter.

Judgment of sentence affirmed.

_____

[7] Smith, however, chose not to introduce such evidence, and the Commonwealth therefore did not have an occasion to offer rebuttal evidence. Thus, we find no abuse of discretion.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/13/2017

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CRIMINAL SECTION**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | **CP- 51-CR-0312371-2006** |
| | CP-51-CR-0312371-2006 Comm. v. Smith, Gerald Opinion | |
| **vs.** | | |
| | ‖‖‖‖‖‖‖‖‖‖‖‖ | |
| **GERALD SMITH** | 7488867861 | |
| | : | **SUPERIOR COURT** |
| | : | **NO. 2660 EDA 2015** |

FILED

AUG 2 2 2016

Criminal Appeals Unit
First Judicial District of PA

**OPINION**

**GEROFF, J.**                                                                 **AUGUST 22, 2016**

On November 26, 2007, following a jury trial before Judge Carolyn Engel Temin, the Defendant, Gerald Smith, was found guilty of murder of the third degree, possessing an instrument of crime, and recklessly endangering another person. On March 4, 2008, the Defendant was sentenced to nine and one-half (9½) to twenty (20) years of incarceration for the offense of murder of the third degree and a consecutive prison term of one (1) to two (2) years for the offense of recklessly endangering another person. No further penalty was imposed on the possessing-an-instrument-of-crime conviction. (Sentencing Volume 1, 03/04/2008, p. 15-16). At trial, the Defendant was represented by Brian McMonagle, Esquire. No direct appeal was filed on the Defendant's behalf.

On February 17, 2009, the Defendant filed a timely *pro se* petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §9541 *et seq.*, in which he alleged ineffective assistance of his trial counsel for failure to appeal the Defendant's convictions. Attorney James Bruno was subsequently appointed to represent the Defendant in the PCRA proceedings. On February 3, 2011, the trial court gave an instruction to Mr. Bruno to obtain from the Defendant a statement explaining whether he had requested his trial attorney to take an appeal. On or about December 7, 2011, Mr. Bruno filed an affidavit ("Verification") on the Defendant's behalf.[1]

On December 9, 2011, the court issued Notice under Rule 907 notifying the Defendant of its intention to dismiss his PCRA Petition for the reason that the issues he raised in the Petition were without merit. Pa.R.Crim.P. 907. On January 23, 2012, the court dismissed the Defendant's Petition.

The Defendant timely appealed; however, Mr. Bruno failed to comply with the court's February 23, 2012 order to provide the court with a Concise Statement of Matters Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure, Rule 1925(b). In addition, Mr. Bruno neglected to file a brief on the Defendant's behalf; this neglect resulted in the matter being remanded to the PCRA court to determine whether or not counsel had abandoned the Defendant.

---

[1] In his affidavit ("Verification"), the Defendant stated, *inter alia*:

> After sentencing, I spoke with my attorney Brian McMonagle and we discussed appealing this matter. He advised me not to file an appeal.
>
> I was immediately taken back to prison and subsequently sent upstate. I contact[ed] my sister ... and requested that she contact Mr. McMonagle because I was unable to contact him.
>
> I later learned that my sister contacted Mr. McMonagle and was told that it was too late to file the appeal.

Verification [Affidavit of Gerald Smith], 12/07/2011, p. 2 [unnumbered].

The appeal was reinstated on July 31, 2012, after counsel belatedly filed the brief. On April 5, 2012, Judge Temin issued an opinion in this matter.[2]

On March 22, 2013, following a temporary suspension from the practice of law, Mr. Bruno requested the Superior Court's permission to withdraw from the case. He also petitioned the Court to have the case remanded to the PCRA court for the appointment of a new counsel. The petition was granted on April 10, 2013.

Thereafter, Janis Smarro, Esquire, was appointed as the Defendant's new counsel. On May 20, 2013, Attorney Smarro filed an "Application to Vacate Briefing Order and for Remand to Trial Court with Leave to File a Concise Statement of Errors Complained of on Appeal and for the Trial Court's Preparation of a Supplemental Pa.R.A.P. 1925(a) Opinion" on the Defendant's behalf.

On June 7, 2013, the Superior Court granted the Application to Vacate. The Superior Court issued an Order remanding the Application to Vacate and the certified record to the PCRA court for a period of 60 days, permitting the Defendant to file a new Rule 1925(b) statement with the PCRA court and instructing the PCRA court to prepare a supplemental opinion pursuant to Rule 1925(a) within thirty days of the date the 1925(b) statement was received.

On June 11, 2013, the Defendant filed a 1925(b) Concise Statement of Errors Complained of on Appeal. In the 1925(b) Statement, the Defendant claimed that his trial counsel was ineffective for failure to protect the Defendant's appellate rights by filing a Notice of Appeal

---

[2] The PCRA court denied the Defendant's PCRA Petition, noting that the affidavit did not aver that the defendant requested counsel to file an appeal and thereby concluding that trial counsel had a reasonable basis for his inaction. Trial Court Opinion, 04/05/2012, pp. 3-4. The PCRA court indicated, however, that the Opinion was written "without the benefit of the 1925(b) statement" due to counsel's failure to file it; the court, therefore, reserved the right to supplement the Opinion in the event the 1925(b) statement, when submitted, raised additional issues. *Id.* at 2.

3

as requested by the Defendant. The Defendant argued that he was entitled to post-conviction relief in the form of the grant of leave to file a Notice of Appeal *nunc pro tunc*.

On June 18, 2014, Natasha L. Lowe, Trial Division/Appeal Unit Supervisor, sent a letter addressed to Joseph D. Seletyn, Esq., Prothonotary of the Superior Court of Pennsylvania, in which she noted that no supplemental opinion would be filed in this matter because Carolyn E. Temin, the trial judge who presided over this case, was no longer sitting as a Judge in Philadelphia County.

On February 9, 2015, the Superior Court issued a decision vacating the PCRA court's order and remanding for an evidentiary hearing.[3] The Superior Court concluded that the PCRA court erred in dismissing the Defendant's PCRA Petition without first conducting an evidentiary hearing; the Superior Court, therefore, relinquished its jurisdiction.

On September 1, 2015, the Defendant's motion to reinstate appellate rights *nunc pro tunc* was heard and granted. On September 2, 2015, the Defendant, through his counsel, filed a Notice of Appeal *Nunc Pro Tunc*. On November 3, 2015, the Defendant's counsel filed, *sua sponte*, a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. § 1925(b).

In his Statement, the Defendant raises the following issues: (1) the Defendant is entitled to an arrest of judgment with regard to his conviction for third-degree murder, recklessly endangering another person, and possessing instruments of crime as the evidence was insufficient to sustain these convictions; (2) the Defendant is entitled to the grant of a new trial

---

[3] Our Superior Court explained that in his affidavit, the Defendant did not state whether or not he requested that his trial counsel appeal his convictions but that he merely indicated "that he intended to appeal." *Commonwealth v. Gerald Smith*, No. 691 EDA 2012, 02/09/2015, p. 7. The Court also noted that it was unclear whether the Defendant's trial counsel adequately consulted with the Defendant with regard to an appeal. The Court explained that because no hearing had been held on this matter, it was not clear whether the discussion which the Defendant had with his attorney, in fact, constituted a consultation. *Id.*

4

as the trial court erred when it denied the Defendant's pretrial motion to suppress statement; and (3) the Defendant is entitled to a new trial as a result of the trial court's ruling which precluded his attempt to introduce evidence concerning the victim's prior suicide attempt. Concise Statement of Errors Complained of on Appeal, 11/02/2015, pp. 1-2.

## THE EVIDENCE

The evidence adduced at trial established beyond reasonable doubt that on March 11, 2006, the Defendant committed murder of the third degree by firing a bullet into the head of the decedent, Lynette ("Net") Logan, then six month pregnant with the Defendant's child, at 906 North 41th Street in the City of Philadelphia. The decedent was killed with a .38 caliber Special Magnum five-shot chrome with black rubber grips, which, by the Defendant's own admission, was the weapon from which the fatal shot was fired. The jury also found the evidence to be sufficient to support the guilty verdict on the charges of possessing an instrument of crime and recklessly endangering another person.

### *The Murder and Investigation*

Police Officer Kert Wilson testified that on March 11, 2006, at about 5 o'clock in the morning, he responded to a radio call about the incident. Officer Wilson arrived at 910 North 31st Street in Philadelphia almost simultaneously with two other police officers, Officer Thelonious Mack and Officer Weise (first name not given). He knocked on the door; after talking to the residents, Officer Wilson concluded that they had arrived at the wrong address. (N.T. Volume 1, 11/20/2007, p. 75-77).

Officer Wilson and the other officers then spotted a man (whom Officer Wilson identified as the Defendant) come around the corner from 41st and Mantua Streets holding a cell

5

phone in his hand. The man explained that it was he who had called police. The man then pointed toward a house at 906 North 41st Street and proceeded toward that house. He walked into the house before the officers could stop him and ask him any questions. (N.T. Volume 1, 11/20/2007, pp. 77-78).

The officers followed the Defendant into the house. Moments later, Officer Wilson saw the Defendant come out of the rear of the house: "[A]ll he said to me was, she's dead, she's back there...." (N.T. Volume 1, 11/20/2007, p. 78).

Officer Wilson and his fellow officers followed the Defendant to the back of the house. There was a female in the tub in the back bathroom; she appeared to be pregnant. The female had a large wound to the side of her head; blood was pouring down her face and the front of her chest. Officer Wilson noticed that the female was breathing. (N.T. Volume 1, 11/20/2007, pp. 78-79).

Upon determining that the female was still alive, Officer Wilson proceeded to notify the Rescue division. When Officers Wilson and Mack walked back to the bathroom area, they noticed that the woman had "like a steak knife in her right hand." Officer Mack removed a small, silver-colored revolver from her left hand. (N.T. Volume 1, 11/20/2007, pp. 79-80).

Officer Wilson stated that he and Officer Mack then carried the victim out of the house, put her in the first police car they could find, which happened to be Officer Neumann's (first name not provided) car, and asked Officer Neumann to drive her to the hospital. A few minutes later, the Defendant was placed into another car, with Officers Mack and Weise. Officer Wilson followed Officer Neumann to the Hospital of the University of Pennsylvania (HUP). (N.T. Volume 1, 11/20/2007, p. 80).

6

Leo Rahill testified that he was a civilian crime scene investigator with the Crime Scene Unit and that he assisted with the investigation of the decedent's shooting death. (N.T. Volume 1, 11/20/2007, p. 91). Mr. Rahill stated that he and Officer John Taggart arrived at the scene at 9:55 am. Several homicide detectives walked Mr. Rahill and Officer Taggart through the scene, which was "within the bathroom" of the first floor of a private residence. (N.T. Volume 1, 11/20/2007, p. 93). At the time of the walk-through, the decedent's remains had already been removed from the scene. (N.T. Volume 1, 11/20/2007, p. 93).

Mr. Rahill indicated that he and Officer Taggart took numerous photographs at the scene, which he reviewed for the benefit of the jury.[4] Mr. Rahill explained that they also searched the home, found and gathered bullets, and retrieved fingerprints from the sink area of the bathroom, the toilet area and the bathtub area. (N.T. Volume 1, 11/20/2007, pp. 95-100, 113).

Mr. Rahill stated that Property Receipt No. 9005009 listed two knives collected from the scene; the knives were collected from the tub area and from the porch. Property Receipt No. 9005006 listed "one silver with black hand grips Rossi M-88, .38 Special five-shot handgun, serial number W357971 loaded with four live cartridges and one spent cartridge (a copper jacket projectile) collected from the bath tub in the bathroom of 906 North 41st Street." (N.T. Volume 1, 11/20/2007, p. 102). The same Property Receipt also listed the package of cartridges collected from the TV stand. Mr. Rahill explained that all the items of ballistic evidence were forwarded to the Firearms Identification Unit for examination by a ballistician. (N.T. Volume 1, 11/20/2007, pp. 103, 105).

Mr. Rahill also stated that before he and his partner processed the crime scene, they were instructed to go to Southwest Detectives' headquarters where they performed a Scanning

_____

[4] He noted, *inter alia*, that one of the photographs, C-8, showed a strike mark. Photographs C-10 and C-11 showed a TV stand; Mr. Rahill explained that in a shelf drawer just under the TV stand there was a box of live cartridges. (N.T. Volume 1, 11/20/2007, pp. 97, 113).

7

Electron Microscope (SEM) test on the Defendant, a suspect at the time. (N.T. Volume 1, 11/20/2007, p. 106).

Under cross-examination, Mr. Rahill stated that the knife and the gun found inside the tub had been processed for prints with negative results. On re-direct examination, he clarified that he, in fact, could not retrieve an identifiable fingerprint from those items as there were "numerous smears and overlays" on them. Mr. Rahill noted that the decedent's fingerprints were identified on the top edge of the tub. (N.T. Volume 1, 11/20/2007, p. 114).

Mr. Leonard Logan testified that he was the decedent's father and that at the time of her death, he was living at 906 North 41st Street. Mr. Logan stated that the decedent had lived with him for over five years. He noted that the decedent and the Defendant were romantically involved for about nine months and that the Defendant moved in with them about five or six months before the decedent's death. Mr. Logan indicated that at the time of her death, the decedent was six months pregnant with the Defendant's child. (N.T. Volume 1, 11/20/2007, pp. 118-19).

Mr. Logan testified that at the beginning, the Defendant presented himself as a "very nice" man; however, once the decedent told him that she was expecting, he changed. (N.T. Volume 1, 11/20/2007, p. 119). Mr. Logan deduced from what he heard around the house that the Defendant did not want the baby and seemed to be angry about the pregnancy. (N.T. Volume 1, 11/20/2007, p. 119).[5] Mr. Logan also noted that when the decedent first announced her pregnancy, the Defendant asked her to get an abortion; however, the decedent, who had always wanted to have a baby, refused to do so. (N.T. Volume 1, 11/20/2007, p. 122). Mr. Logan

---

[5] Mr. Logan explained that he was able to overhear the discussions because the "voices would start to become raised"; the pattern would repeat itself "at least once to twice a week." (N.T. Volume 1, 11/20/2007, p. 120).

pointed out that despite his displeasure with the decedent's pregnancy, the Defendant continued to live in his house. (N.T. Volume 1, 11/20/2007, p. 129).

Mr. Logan stated that he last saw the decedent on the night of March 10, 2011. Mr. Logan, his friend and the decedent went out for dinner and had a pleasant time. Mr. Logan explained that he and his friend also wanted to take the decedent to the movies; however, she did not want to be away from the Defendant too long and they drove her home after dinner, at about 9:30 or 10:00 pm. (N.T. Volume 1, 11/20/2007, pp. 120-21).

Mr. Logan noted that the decedent's daughter, Gianni, was born "right at the time [her mother] was killed" and that Gianni was living with Mrs. Demby, the child's grandmother. (N.T. Volume 1, 11/20/2007, p. 123).

Mr. Logan also testified that the decedent never told him about her desire to take her own life, but admitted that he had learned about this circumstance from other sources. When asked whether the decedent attempted suicide, Mr. Logan responded, "Not actually." (N.T. Volume 1, 11/20/2007, p. 127).

Although Mr. Logan indicated that the decedent was a very "happy-go-lucky type [of] woman," he conceded that she did seek treatment for her depression and that she, in fact, "'302'd herself" in an effort to address it. (N.T. Volume 1, 11/20/2007, pp. 126-27).

Detective Mary Kuchinsky testified that she was assigned to the Southwest Detective Division and that she interviewed the Defendant the day of the fatal shooting, in the early morning hours. Other detectives were present in the room at the time of the Defendant's interview at the Southwest Detective Division. (N.T. Volume 1, 11/20/2007, pp. 132-33).

Detective Kuchinsky testified that the Defendant appeared upset, but that he was very articulate and appeared coherent. Detective Kuchinsky explained that she did not give the

9

Defendant his *Miranda* warnings because at the time they spoke, she interviewed him as a witness, not as a suspect. (N.T. Volume 1, 11/20/2007, p. 134). Detective Kuchinsky explained, *inter alia*,

> The difference between an interview or an interrogation or what we call statement is if you're a witness to a crime or … you're the complainant on the crime. You're brought into the Southwest Detective Division and you're interviewed as to what happened. If you are a suspect or a defendant, you're brought in, and it's believed you have committed this crime, you're read your *Miranda* warnings … and then a statement is taken from you if you agree to give a statement.

(N.T. Volume 1, 11/20/2007, pp. 134-35).

Detective Kuchinsky testified that the interview on March 11, 2006 started at 6:50 am and that the Defendant was not handcuffed when they talked. Detective Kuchinsky typed up the questions and the Defendant's answers on the computer. After reviewing his printed statement, the Defendant signed and dated both pages. (N.T. Volume 1, 11/20/2007, p. 136).

For the benefit of the jury, Detective Kuchinsky read her questions and the Defendant's answers. During the interview, the Defendant stated that he and the decedent had been romantically involved and that the decedent was about six months pregnant with his child. (N.T. Volume 1, 11/20/2007, pp. 137-42). The Defendant stated that on March 11, 2006, they got into an argument after 3:00 am and that the decedent subsequently demanded that he "get out." (N.T. Volume 1, 11/20/2007, p. 137-38). The Defendant explained that he then went outside and sat on the church steps on the street corner. He was talking on the phone with his female friend, Whitney, when he received a phone call from the decedent; he ignored the call. (N.T. Volume 1, 11/20/2007, p. 138). According to the Defendant's narrative of facts, thereafter, the story unfolded as follows:

> About 30 seconds later, I heard a gunshot. I ran into the house and I seen Lynette in the tub in the bathroom. She had a gun in one hand and a knife

10

in the other hand. She was bleeding from her head. I grabbed the gun from her hand. I touched her, then I dropped the gun and I ran out of the apartment.

(N.T. Volume 1, 11/20/2007, p. 138).

As stated by the Defendant, he then rushed around the corner to the house of his friend, Dana Harding, to call the police, as his cell phone battery was dead. The Defendant indicated that when he called the police, he was not quite sure of the exact address of the decedent's residence; as a result, the police initially arrived at the wrong address. He noted that when the police finally reached the decedent's house, a police officer told the Defendant to come outside, then put him in the back of the police car and brought him to the Southwest Detective Division. (N.T. Volume 1, 11/20/2007, pp. 138-39, 141).

Detective Kuchinsky stated that, according to the Defendant, he was unaware that there was a gun in the house and that he supposedly saw it for the first time in the decedent's left hand as she was lying in the tub. (N.T. Volume 1, 11/20/2007, pp. 139-40). The Defendant described the gun as a "silver gun," which reminded him of a "Dirty Harry gun." (N.T. Volume 1, 11/20/2007, p. 140).

Detective Kuchinsky confirmed that while the Defendant was at Southwest Detectives, no one had threatened him or harmed him. She also noted that, following the interview, she received from one of the investigators at the scene information which caused her to have the Defendant's hands bagged for a gunpowder residue test. (N.T. Volume 1, 11/20/2007, pp. 143-44).

Detective Aaron Booker testified that as a member of the Homicide Unit of the Philadelphia Police Department, he was the assigned detective and that he initially came into

11

contact with the Defendant at the Homicide Division where the Defendant was transported from Southwest Detectives. (N.T. Volume 1, 11/20/2007, pp. 144-47).

Detective Booker interviewed the Defendant at the Homicide Division. The interview started at about 3:00 pm; Detective Richard Reinhold, Detective Booker's partner at the time, was present for the majority of the interview. (N.T. Volume 1, 11/20/2007, pp. 148-49).

Detective Booker testified that he and the Defendant started with a general conversation followed by a formal statement. Initially, they briefly talked about the statement the Defendant had given at Southwest Detectives. "I told him if there's anything that... he thought that he should tell me, now [was] the time. And frankly, he lowered his head and then told me ... he wanted to tell the truth." (N.T. Volume 1, 11/20/2007, p. 162).

Thereafter, Detective Booker gave the Defendant the *Miranda* warnings. Detective Booker noted that the Defendant's responses indicated that he wanted to speak without the presence of counsel. (N.T. Volume 1, 11/20/2007, pp. 149-51).

In his statement, the Defendant explained that on the night of the shooting, he returned to the house (where he lived with the decedent and her father) at 3:30 am. The Defendant and the decedent started arguing shortly thereafter because the decedent was drinking water out of a jug and the Defendant did not like that. They were going "back and forth" when his cell phone rang; the Defendant pushed the 'ignore' button. (N.T. Volume 1, 11/20/2007, pp. 156-57).

According to the Defendant, the decedent then confronted him with receiving phone calls from "one of [his] bitches," upon which the Defendant took his phone and started heading toward the door. (N.T. Volume 1, 11/20/2007, p. 157). They continued "saying things to try to hurt each other's feelings" until the decedent demanded that the Defendant get out. (N.T. Volume 1, 11/20/2007, p. 157).

12

While outside, the Defendant called back the lady whose phone call he had ignored minutes earlier. (N.T. Volume 1, 11/20/2007, p. 157). While he was on the phone with that lady, he ignored an incoming phone call from the decedent. His phone "died about a minute later." (N.T. Volume 1, 11/20/2007, p. 158).

The Defendant then went back inside the house. He noticed that the decedent was now fully dressed. When he asked her about the reason for that circumstance, she responded, "When they see me dead, I want to be fully dressed." (N.T. Volume 1, 11/20/2007, p. 157). The Defendant indicated that the decedent was holding a knife in her hand and "started talking that suicidal stuff again." (N.T. Volume 1, 11/20/2007, p. 158).

> I said, "'You talking that crazy shit again?' I told her to go ahead and do it. She walked into the bathroom and got into the tub. I went into the bathroom and I had my gun out. I had already pulled the hammer back. I handed the gun to her and told her to go ahead, this would be easier. I left the bathroom and closed the door. I was hoping that I wouldn't hear no gunshots. After a couple of minutes without hearing a shot, I went back into the bathroom. She had the gun in her hand and was saying that it was stuck and that she didn't know how to do it. I grabbed the gun from her and the hammer was still cocked. As I was attempting to make the gun safe by gently lowering the hammer, it suddenly went off. The bullet hit her in the side of the head and she fell sideways. She was already laying down in the tub. I went into shock. I said, 'Oh, shit. Oh, shit. I killed Net. My life is over.' I thought she was dead. I put the gun in the tub and put her hand around the gun. I panicked. I ran to the front door, then back to the bathroom, then I went out the door and hopped on my bike and rode to Dana's house on 43rd Street.

(N.T. Volume 1, 11/20/2007, pp. 158-59).

The Defendant stated to Detective Booker that the gun from which the fatal shot was fired was a ".38 caliber Special Magnum five-shot chrome with black rubber grips." (N.T. Volume 1, 11/20/2007, p. 159). He noted that he left the gun (which he obtained "off the streets") in the decedent's hand. (N.T. Volume 1, 11/20/2007, p. 159).

13

When Detective Booker asked the Defendant if he communicated to anyone other than police that he had shot the decedent, he responded that he had told his friend Dana, the decedent's father and a 9-1-1 dispatcher that the decedent committed suicide. (N.T. Volume 1, 11/20/2007, pp. 159-60).

The Defendant also acknowledged not being truthful during his earlier interview at Southwest Detectives. "I know that I did something wrong. I made a mistake. I just hope that I can better myself after I serve my time. Also, I wouldn't hurt anyone intentionally to this degree." (N.T. Volume 1, 11/20/2007, p. 160). Detective Booker stated that the Defendant then reviewed his statement and signed each page. He declined being videotaped. (N.T. Volume 1, 11/20/2007, p. 160).

Detective Booker stated that at the time he gave the statement, the Defendant was coherent and that his demeanor was "calm and collected." (N.T. Volume 1, 11/20/2007, p. 161).

Ms. Gwendolyn Demby testified that the decedent was her daughter. She stated that she had custody of Gianni Logan, the decedent's daughter, who was 20 months old at the time of the trial. Ms. Demby indicated that Gianni, who was born prematurely at 29 weeks, remained at the Hospital of the University of Pennsylvania for three months and that she was diagnosed with chronic lung disease. (N.T. Volume 1, 11/21/2007, pp. 53-54).

Answering the Assistant District Attorney's question with regard to what hand the decedent favored, Mrs. Demby responded that the decedent was right-handed. (N.T. Volume 1, 11/21/2007, p. 54).

Scharletta McNeil testified for the defense. Ms. McNeil stated that she was the Defendant's older sister and that she knew the decedent well. Ms. McNeil noted that she had

14

seen the decedent and the Defendant a few days before the shooting when they came to her mother's place and stayed overnight. (N.T. Volume 1, 11/21/2007, pp. 86-87, 94).

Ms. McNeil indicated that prior to coming to her mother's place, the decedent and the Defendant had been shopping; when they came to the house, they showed her some items they had purchased for the baby earlier that day. Ms. McNeil stated that they both appeared happy and were "making jokes." (N.T. Volume 1, 11/21/2007, p. 88).

Ms. McNeil explained that she first learned about the shooting from the Defendant, who called her at about 2:30 or 3:00 in the morning and, without giving any details, urged her to come to the house as soon as possible. (N.T. Volume 1, 11/21/2007, pp. 89, 92). When Ms. McNeil arrived at the house accompanied by her husband, the Defendant was already in the police car. Upon securing a police officer's permission to talk to the Defendant, she approached the Defendant who was crying. At the Defendant's request, she got in touch with the decedent's father. (N.T. Volume 1, 11/21/2007, pp. 89-91).

Ms. McNeil testified that the Defendant told her that the decedent was shot but did not give any further details; Ms. McNeil did not ask any questions. She noted, however, that she had never seen her brother with a gun. (N.T. Volume 1, 11/21/2007, pp. 93-94).

## *Expert Testimony*

## Testimony of Dr. Ian Hood, an Expert in the Field of Forensic Pathology

Dr. Ian Hood, Deputy Medical Examiner for the City and County of Philadelphia, testified as an expert in the field of forensic pathology. Dr. Hood stated that he supervised Dr.

Gary Collins in the performance of the autopsy of Lynette Logan. (N.T. Volume 1, 11/21/2007, pp. 55-56, 60).

Dr. Hood testified that the autopsy was performed on March 13, 2011, after the decedent was pronounced dead at the HUP, where her baby was delivered. (N.T. Volume 1, 11/21/2007, pp. 60-61).

The decedent sustained one perforating gunshot wound to the head, "a very large ragged gaping wound [,] star-shaped." (N.T. Volume 1, 11/21/2007, p. 62). The exit wound was in front of the decedent's right ear; the bullet had passed across her head going from the left part of her forehead to her right cheek. (N.T. Volume 1, 11/21/2007, p. 62).[6] The soot and searing noted both around the edges of the tip of the big central star-shaped wound indicated that "the gun had to be in contact with the skin at the time." (N.T. Volume 1, 11/21/2007, p. 63). In addition, the soot which came out of the end of the gun followed the bullet "right down to the bone." (N.T. Volume 1, 11/21/2007, p. 63).

Dr. Hood explained that the bullet devastated the brain and that even the gas entered the head causing further damage in the brain; all the bones of the decedent's frontal skull were fractured. Although the brain had sustained fatal damage, the brainstem was intact; Dr. Hood opined that that condition may have been the reason that the decedent had a heartbeat when she was found. (N.T. Volume 1, 11/21/2007, p. 64).

Based on the examination of the decedent's remains, Dr. Hood concluded to a reasonable degree of medical certainty that the decedent died from the effects of a gunshot

---

[6] Dr. Hood also stated that an internal examination of the decedent was also conducted. Dr. Hood explained that all of the decedent's vital organs were donated but that the remaining organs were "fine." (N.T. Volume 1, 11/21/2007, p. 63).

16

wound to the head and that the manner of the decedent's death was homicide. (N.T. Volume 1, 11/21/2007, pp. 65-66).

### Testimony of Police Officer Ernest Bottomer, an Expert in the Field of Firearm Identification

Police Officer Ernest Bottomer testified as an expert in the field of firearm identification. Officer Bottomer stated that he performed an examination of the ballistics evidence in connection with the investigation of the decedent's shooting death and issued a report thereto. (N.T. Volume 1, 11/21/2007, pp. 18-20, 24).

Officer Bottomer stated that he received a .38 caliber Special revolver retrieved from the crime scene at 906 North 41st Street. The firearm had a stainless-steel finish; it had an approximately two-inch barrel and could hold five cartridges in the cylinder. Officer Bottomer confirmed that he also received four cartridges and one fired cartridge casing (FCC-1) on the same Property Receipt No. 9005006. (N.T. Volume 1, 11/21/2007, pp. 27-28).

Officer Bottomer acknowledged that there were safety devices in the firearm to prevent the hammer from going forward too quickly. He explained that in order to make the hammer move, one needed actually to pull the trigger.[7] (N.T. Volume 1, 11/21/2007, pp. 31-32).

Officer Bottomer stated that he test-fired the gun and that it never misfired, jammed or otherwise malfunctioned. (N.T. Volume 1, 11/21/2007, p. 34).

Officer Bottomer explained that the FCC and the four unfired cartridges[8] were manufactured by CBC, a Brazilian cartridge company. He noted that there was a shallow

---

[7] Officer Bottomer noted that there was another, not recommended way of lowering the hammer, which involved "grab[bing] the hammer, pull[ing] the trigger and eas[ing] the hammer down." (N.T. Volume 1, 11/21/2007, p. 32). He explained that lowering the hammer in this fashion was a "bad idea": "If I cock that hammer and I pull the trigger and my thumb slips, that gun will fire." (N.T. Volume 1, 11/21/2007, p. 32).

17

indentation on the bottom of one of the cartridges, which could be consistent with someone lowering the hammer in a safe fashion and not firing the bullet. (N.T. Volume 1, 11/21/2007, pp. 34-35).

On the same Property Receipt, he also received a projectile (which he labelled "bullet B-1"). Officer Bottomer determined that B-1 was either a .38 or .357 caliber; there was a copper or copper alloy jacket surrounding the lead core inside, and it had the impressions of six land and grooves on the surface. Officer Bottomer noted in his report that B-1 was covered with white chalk-like substances consistent with the bullet hitting a tile or wall with plaster. (N.T. Volume 1, 11/21/2007, pp. 35-36).

Officer Bottomer also took delivery of a partially filled box of unfired .38 Special-caliber cartridges on the same Property Receipt. The box contained 24 cartridges made by CBC, the same company which manufactured the other four cartridges, and a Winchester cartridge, which was an "old style" cartridge. (N.T. Volume 1, 11/21/2007, pp. 36-37).

Additionally, Officer Bottomer received five cartridges in a separate envelope. He also received FCC-2, which was made by the same manufacturer as FCC-1 and was also of a .38 Special caliber. (N.T. Volume 1, 11/21/2007, pp. 36-38).

Officer Bottomer stated that when he examined FCC-1, he noted insufficient microscopic patterns; he, therefore, was unable to testify with any scientific certainty that it was fired from the revolver as there were "not enough markings on it to say accurately or definitively that it was." (N.T. Volume 1, 11/21/2007, p. 39). Officer Bottomer indicated that projectile, B-1, was consistent with having been fired from the revolver but noted that due to the lack of microscopic marks, he could not say that it definitely was. (N.T. Volume 1, 11/21/2007, pp. 40-41). FCC-2

---

[8] It was agreed by and between counsel that the four cartridge cases "were all inside the gun when it was retrieved by the police originally." (N.T. Volume 1, 11/21/2007, p. 45).

18

was found to have been fired from the revolver and was determined scientifically to match the firearm. (N.T. Volume 1, 11/21/2007, p. 40-41).

Officer Bottomer confirmed that he also received five unfired CBC-brand brass-cased cartridges, which were of the same design as the other cartridges on the Property Receipt. (N.T. Volume 1, 11/21/2007, p. 41).

### *Stipulations*

It was stipulated by and between counsel that the decedent's name was Lynette Logan. (N.T. Volume 1, 11/20/2007, p. 81).

It was also stipulated that if Officer Tamara Chisholm were to testify, she would state that she encountered the Defendant in the hours after he had given a statement to Detective Booker, and that after the Defendant left the area where she encountered him, police found five .38-caliber cartridges underneath a bench. (N.T. Volume 1, 11/21/2007, pp. 16-17).

It was also stipulated that if Detective Hesser (first name not provided) were to testify, he would state that he was sent to speak with the Defendant and to gather the above-mentioned cartridges into evidence. Detective Hesser would testify that after he informed the Defendant that some items had been located in the area where he had been held previously, the Defendant responded, "What, the shells? I forgot they were in my pocket." (N.T. Volume 1, 11/21/2007, p. 17). Additionally, it was stipulated that these five cartridges were placed on Property Receipt No. 2641423 and that they were subsequently submitted to the Firearms Identification Unit. (N.T. Volume 1, 11/21/2007, p. 17).

It was further stipulated that if Mr. Clifford Parsons were to take the stand, he would testify that he received the developed latent fingerprints from Mr. Rahill and that he performed

19

the actual comparisons of the fingerprints. Mr. Parsons would confirm that the decedent's fingerprints were on the top of the bathtub. (N.T. Volume 1, 11/21/2007, p. 70).

Finally, there was a stipulation that the Defendant's hands were bagged at Southwest Detectives, that Mobile Crime took samples for the purposes of the gunshot residue test, that the gunshot residue test was completed by the R.G. Lee Group and that "the results of [the test] were that particles were found on each hand consistent with having been in contact with a firearm." (N.T. Volume 1, 11/21/2007, p. 71).

## SUFFICIENCY OF THE EVIDENCE

The Defendant claims that there is insufficient evidence to establish beyond reasonable doubt his guilt of each of the crimes for which he stands convicted. The Defendant argues that the evidence did not demonstrate that his "actions were accompanied by malice, that he consciously disregarded an unjustified and extremely high risk that his actions would cause serious bodily injury, that he engaged in reckless conduct placing another or tending to place another in danger of death or serious bodily injury or that he used or possessed an instrument of crime." Concise Statement of Errors Complained of on Appeal, 11/02/2015, pp. 1-2.

Upon review of the record, this court finds the Defendant's claims to be meritless. This court is satisfied that, viewing the evidence and all the inferences derived therefrom in the light most favorable to the Commonwealth, there was sufficient evidence to sustain the Defendant's convictions.

In passing upon a motion in arrest of judgment, the sufficiency of the evidence must be evaluated upon the entire trial record; all evidence must be read in the light most favorable to the Commonwealth, which is entitled to all reasonable inferences arising therefrom; the effect of

20

such a motion is to admit all facts which the Commonwealth's evidence tends to prove. *Commonwealth v. Johnson*, 428 Pa. Super. 494; 631 A.2d 639 (1993)(*citing Commonwealth v. Blevins*, 453 Pa. 481, 483, 309 A.2d 421, 422 (1973)).

The standard for reviewing whether the conviction was based on sufficient evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, the court is able to ascertain that there existed sufficient evidence to enable the fact-finder to find every element of the crime beyond reasonable doubt. *Commonwealth v. Lewis*, 2006 PA Super 314, ¶ 4, 911 A.2d 558, 563 (2006).

To sustain the conviction, the facts and circumstances relied on by the Commonwealth must show that every essential element of the crime has been established beyond reasonable doubt. *Com. v. Hargrave*, 2000 PA Super 5, ¶ 7, 745 A.2d 20, 22 (2000). While guilt may never rest upon conjecture or surmise, a conviction may stand on "wholly circumstantial evidence." *Commonwealth v. Diggs*, 597 Pa. 28, 36, 949 A.2d 873, 877 (2008). *See also Commonwealth v. Roscioli*, 454 Pa. 59, 62, 309 A.2d 396, 398 (1973) ("[T]he Commonwealth does not have to establish guilt to a mathematical certainty, and may in the proper case rely wholly on circumstantial evidence….").


### Third-Degree Murder

The Defendant claims that the evidence was insufficient to support the guilty verdict on the charge of murder of the third degree. He declares that the evidence did not prove that his actions involved malice and that he consciously disregarded an unjustified and extremely high risk that his actions would cause serious bodily injury. The Defendant's meritless claim must fail.

21

Under Pennsylvania law, murder of the third degree is a criminal homicide committed with malice. 18 Pa.C.S § 2502 (c). *See also Commonwealth v. Carter*, 481 Pa. 495, 498–99, 393 A.2d 13, 15 (1978) ("Murder of the third degree is an unlawful killing with malice expressed or implied, but absent any specific intent to take a life.") (citation omitted).

A person may be convicted of third-degree murder where the killing was committed with the requisite malice aforethought. *Commonwealth v. Reilly*, 519 Pa. 550, 549 A.2d 503 (1988). The *mens rea* essential for third-degree murder requires that a defendant act under a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Drum*, 58 Pa. 9, 15 (1868); *Commonwealth v. Shaffer*, 722 A.2d 195, 199 (Pa. Super. Ct. 1998).

In order to establish that one committed murder of the third degree, "the Commonwealth need not show he acted with the specific intent to kill another but merely that he acted with malice aforethought or wanton and reckless conduct that manifests extreme indifference to the value of human life." *Commonwealth v. Bullock*, 2008 PA Super 83, ¶ 9, 948 A.2d 818, 823–24 (2008). Evidence that defendant "consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm" is sufficient to support a conviction of third-degree murder even though the killing was unintentional. *Commonwealth v. Dennis*, 506 Pa. 460, 461, 485 A.2d 1097, 1097–98 (1984). *See, e.g., Commonwealth v. Young*, 494 Pa. 224, 228, 431 A.2d 230, 232 (1981) (finding the existence of malice where the defendant's conduct "unjustifiably created an extremely high degree of risk," regardless of whether the gun discharged accidentally or was fired intentionally).

In the case *sub judice*, the Defendant is not contesting the fact that his actions led to the decedent's death. The evidence established that the decedent's death stemmed from a gunshot

22

wound to her head, that the gun was in the Defendant's hands at the time it went off, and that the finger which pulled the trigger was, in fact, the Defendant's finger.

Here, following an altercation with the Defendant, the decedent put on her clothes at daybreak (explaining that she wanted to be fully dressed when found dead), armed herself with a knife and, by the Defendant's account, was talking "suicidal stuff." The Defendant, who was romantically involved with the decedent and was aware of her depression and prior suicidal tendencies, demonstrated "conscious disregard of unjustified and extremely high risk that his actions might cause death or serious bodily injury," *Dennis, supra*, when he suggested that she use a gun instead of a knife to take her own life and handed her his firearm, which he knew was loaded with five live bullets. The Defendant further exhibited cruel and wanton conduct when, after the decedent complained of "some problem" with the firearm, he took the gun out of her hand, put it against her head and then supposedly tried to disarm it (following which action the gun discharged, thereby mortally wounding the decedent).[9]

Furthermore, the Defendant demonstrated consciousness of guilt by placing the revolver in the decedent's hand to create an appearance of suicide and not homicide.[10] In addition, the Defendant initially insisted that the decedent committed suicide and denied any personal involvement in the shooting; it is only after the SEM test revealed the presence of lead residue on his hands that he ultimately conceded his guilt.

This court is satisfied that the Commonwealth met its burden of proving beyond reasonable doubt that the Defendant acted with the requisite malice sufficient to find him guilty

---

[9] As the Assistant District Attorney noted in her closing argument, "And if you believed that he put [the gun] against her head to try and make it safe, then I submit to you … that … takes reckless to new heights." (N.T. Volume 1, 11/26/2007, p. 47).

[10] Incidentally, the decedent, who was right-handed, was found with the gun in her left hand.

of murder of the third degree. It is of no moment whether the gun discharged accidentally or was intentionally fired: the Defendant's cruel and wanton actions exhibited his extreme indifference to the value of human life and created an unjustifiably high degree of risk of causing death or serious bodily harm. No relief is due.

## Possessing an Instrument of Crime

The Defendant further argues that the evidence was insufficient to support the guilty verdict on the charge of possessing an instrument of crime. The Defendant's argument is without merit.

Under the law, a person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally. 18 Pa.C.S. § 907(a). An instrument of crime includes any item the actor used for criminal purposes and had in his possession under circumstances not manifestly appropriate for any lawful uses the item may have. *Id.* To convict of this offense, the Commonwealth must prove that the Defendant "possessed [the] gun under circumstances manifestly inappropriate for such lawful uses the gun may have had and with an intent to employ it criminally." *Commonwealth v. Jeter*, 275 Pa. Super. 89, 94, 418 A.2d 625, 628 (1980).

Here, there was sufficient evidence for the jury to find beyond reasonable doubt that the Defendant possessed an instrument of crime, a .38-caliber Special Magnum five-shot chrome revolver with black rubber grips, which the Defendant had control of and which was the weapon which caused the decedent's death. The Defendant used the firearm (which he identified as "my gun" obtained "off the streets") criminally when he purposely gave it to the vulnerable and suicidal decedent, suggesting that it was superior to a knife as a weapon of choice with which to

24

take one's life. The Defendant's subsequent unsuccessful attempt "to uncock" the firearm resulted in the gun's fatal discharge.

In addition, the analysis of the ballistics evidence presented in this case established, *inter alia*, that an FCC (FCC-2) was fired from the revolver. Furthermore, a SEM test performed on the Defendant's hands revealed that the Defendant, in fact, pulled the trigger.

This court is firmly of the belief that, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as the verdict winner, there was sufficient evidence to enable the jury to find every element of possessing an instrument of crime beyond reasonable doubt. No relief is due.

## Recklessly Endangering Another Person

The Defendant also avers that the evidence did not show that he engaged in reckless conduct placing another or tending to place another in danger of death or serious bodily injury. The Defendant's claim is without merit and must fail.

Under Pennsylvania law, where a person "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury," he or she commits a misdemeanor of the second degree. 18 Pa.C.S. § 2705. Serious bodily injury is "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Commonwealth v. Martuscelli*, 2012 PA Super 213, 54 A.3d 940, 949 (2012).

In order to sustain a conviction of recklessly endangering another person, "the Commonwealth must prove that the defendant had an actual present ability to inflict harm and

25

not merely the apparent ability to do so. Danger, not merely the apprehension of danger, must be created." *Commonwealth v. Cianci*, 130 A.3d 780, 782 (Pa. Super. 2015) (citation omitted).

The *mens rea* required for the crime of recklessly endangering another person is a "conscious's disregard of a known risk of death or great bodily harm to another person." *Commonwealth v. Peer*, 454 Pa. Super. 109, 115, 684 A.2d 1077, 1080 (1996) (quoting *Commonwealth v. Cottam*, 420 Pa. Super. 311, 344, 616 A.2d 988, 1004 (1992)). *See, e.g., Commonwealth v. Rivera*, 409 Pa. Super. 120, 126, 597 A.2d 690, 693 (1991) (even though the defendant did not know how the gun operated, evidence that he was aware that it was loaded yet pointed it directly at his wife's stomach "was sufficient to convict him of reckless endangerment regardless of lack of intent to cause her harm").

In the present case, the Defendant, who was in a relationship with the decedent and who was aware that she was six months pregnant with their child, demonstrated a conscious disregard of a known risk of death or great bodily harm to the unborn child when he gave his gun to the suicidal decedent and advised her to use it to kill herself. The Defendant's act amounted to a gross deviation from the standard of conduct which a reasonable person would have followed if faced with this situation. Through his actions, the Defendant displayed an actual present ability to inflict harm to the unborn child and not just an apparent ability, *Peer, supra*, as by his reckless act, he placed the unborn child in danger of death or serious bodily injury.

Even though Gianni Logan, the decedent's and the Defendant's daughter, was miraculously delivered at the time of her mother's death, she was severely harmed by the Defendant's actions. Born prematurely at twenty-nine weeks, she spent months at the hospital and suffered an organ impairment as evidenced by her diagnosis of chronic lung disease. (N.T. Volume 1, 11/21/2007, pp. 53-54).

26

After considering all the direct and circumstantial evidence in this matter, this court concludes that the jury correctly convicted the Defendant of reckless endangerment after finding that the Commonwealth established beyond reasonable doubt that the Defendant's reckless action placed Gianni Logan in danger of death or serious bodily injury. No relief is due.

## PRETRIAL MOTION TO SUPPRESS STATEMENT

Next, the Defendant argues that this court erred in denying his pretrial Motion to Suppress Statement. The Defendant claims that the statement was obtained in violation of his *Miranda* rights and that the statement was not otherwise voluntarily, knowingly, and intelligently given. This argument must fail.

The appellate court's standard of review of a denial of a motion to suppress is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. *Commonwealth v. Moye*, 2003 PA Super 431, ¶ 5, 836 A.2d 973, 976 (2003) (quoting *Commonwealth v. McClease*, 750 A.2d 320, 323-24 (Pa. Super. 2000)). The scope of review is limited; the appellate court may consider "only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Id.* (quoting *Commonwealth v. Maxon*, 798 A.2d 761, 765 (Pa. Super. 2002)). When faced with conflicting testimony, the appellate court defers to the suppression court, which, as fact-finder, passes upon the credibility of witnesses and whose findings are not disturbed when supported by the record. *Commonwealth v. Gindlesperger*, 706 A.2d 1216, 1219 (Pa. Super. 1997) *aff'd*, 560 Pa. 222, 743 A.2d 898 (1999) (citing *Commonwealth v. Marshall*, 523 Pa. 556, 568 A.2d 590 (1989)). Where the record supports the findings of the suppression court, the appellate court is bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts. *Moye, supra.*

27

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). The word "interrogation" refers to questioning or conduct by police which is calculated to, expected to, or likely to evoke admissions. *Commonwealth v. Simala*, 434 Pa. 219, 252 A2d 575 (1966). In *Rhode Island v. Innis*, 446 U. S. 291, 301, 100 S. Ct. 1682, 1689-1690 (1980), the U.S. Supreme Court advised as follows:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.*

Voluntary statements are not barred from admission by *Miranda* in criminal prosecutions. *Commonwealth v. Wiggins*, 472 Pa. 95, 371 A.2d 207 (1977). The burden is on the Commonwealth to prove by a preponderance of evidence that the statements were voluntary, *Commonwealth v. Ravenell*, 448 Pa. 162, 166, 292 A.2d 365, 367 (1972), and that they were obtained after a knowing, intelligent, and voluntary waiver of constitutional safeguards, *Commonwealth v. Goodwin*, 460 Pa. 516, 520-21, 333 A.2d 892, 894 (1975).

A statement is voluntary if the decision to speak was the product of a free and unconstrained choice. *Commonwealth v. Ritter*, 462 Pa. 202, 204, 340 A.2d 433, 434 (1975). In *Commonwealth v. O'Bryant*, 479 Pa. 534, 388 A.2d 1059 (1978); *cert denied*, 439 U. S. 990, 99 S. Ct. 589, the Court stated, *inter alia*:

28

To determine voluntariness, the totality of the circumstances surrounding the statement must be examined, including: duration and methods of interrogation; the conditions of confinement; the manifest attitudes of the police toward the defendant; defendant's physical and psychological condition; and any other condition which may drain the defendant's power of resistance to suggestion or to undermine his ability to exercise free will. *See Culombe v. Connecticut*, 367 U. S. 568, 81 S. Ct. 1860, 6 L. Ed.2d 1037 (1961); *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976).

*Id.* at 1062.

When the question of voluntariness passes beyond the realm of physical coercion and into degrees of psychological coercion, most careful attention will be afforded to any facts, circumstances or events tending to overbear the will of the accused. *Commonwealth v. Starkes*, 461 Pa. 178, 185, 335 A.2d 698, 701 (1975).

While under Fifth Amendment jurisprudence, an explicit waiver is not required, Pennsylvania has developed a more nuanced approach, which requires that a defendant express a manifestation of the desire to waive his or her *Miranda* rights. *Commonwealth v. Baez*, 2011 PA Super 109, 21 A.3d 1280, 1283 (2011). It is well settled that it is the Commonwealth's burden to establish that a defendant knowingly and voluntarily waived his *Miranda* rights. In order to do so, the Commonwealth must demonstrate that the proper warnings were given and that the accused manifested an understanding of these warnings. *Commonwealth v. Eichinger*, 591 Pa. 1, 24, 915 A.2d 1122, 1135-36 (2007).

In the present case, the Defendant moved to suppress a statement he made at Southwest Detectives, arguing that he was, in fact, subjected to custodial interrogation without *Miranda* warnings. Contrary to the Defendant's claims, this court finds that the Defendant's statement was voluntary.

Here, at the Motion Hearing, Detective Kuchinsky testified that on March 11, 2006, at about 6:50 a.m., she interviewed the Defendant with regard to an incident concerning a shooting.[11] At the time of the interview, Detective Kuchinsky did not have any information with regard to the circumstances of the deceased's death other than that she had died from a gunshot wound; the Defendant was a witness not a suspect at that time. Accordingly, Detective Kuchinsky did not give *Miranda* warnings to the Defendant who was not in custody. (N.T. Volume 1, 11/20/2007, pp. 15-17).

Detective Kuchinsky noted that no one threatened the Defendant (who appeared to be "very articulate") and that he was not cuffed. (N.T. Volume 1, 11/20/2007, p. 18). At the conclusion of the hour-long interview, after reading the typed document prepared by Detective Kuchinsky, the Defendant signed and dated each page. (N.T. Volume 1, 11/20/2007, pp. 19-20).

Detective Kuchinsky also explained that when she talked to the Defendant, she operated on the assumption that the incident was a suicide, not a homicide. (N.T. Volume 1, 11/20/2007, p. 23). Detective Kuchinsky clarified that it was only after the interview that she received the information from the crime scene that the incident "possibly ... wasn't a suicide and that the witness may have been involved in the actual crime." (N.T. Volume 1, 11/20/2007, p. 25). That circumstance prompted Detective Kuchinsky to make arrangements for testing the Defendant's hands for gunpowder residue, following which test the Defendant was transported from Southwest Detectives to the Homicide Division. (N.T. Volume 1, 11/20/2007, pp. 19-20).

Defense counsel argued that the Defendant was placed into custody by police and that because there was an uncertainty with regard to exactly what had happened in the fatal shooting,

---

[11] Detective Kuchinsky testified at the motion hearing in line with her witness testimony which she subsequently offered at the Defendant's trial. *See* N.T. Volume 1, 11/20/2007, pp. 132-44.

"[I]t was incumbent upon Detective Kuchinsky to warn the Defendant, particularly as soon as the Defendant told her that he had been involved in an argument with the complainant." (N.T. Volume 1, 11/20/2007, p. 29). Defense counsel insisted that Detective Kuchinsky neglected her duty to warn the Defendant of his Constitutional rights and averred that "any rational, reasonable police officer would have been on notice that this defendant was a suspect." (N.T. Volume 1, 11/20/2007, pp. 29-30). Defense counsel posited that, had the Defendant been warned of his rights, he would have abstained from making a statement. (N.T. Volume 1, 11/20/2007, p. 30).

The Assistant District Attorney explained that the Defendant was brought in as a witness, "to figure out what's going on." (N.T. Volume 1, 11/20/2007, p. 31). Accordingly, the Commonwealth concluded that at the time of the interview, "there was no real obligation on the part of the detectives to give him any constitutional rights ... at that point they are just trying to do a general investigation...." (N.T. Volume 1, 11/20/2007, p. 31).

Judge Temin agreed with the Commonwealth's conclusion that at the time of the interview, the detective did not have any cause to assume that the Defendant was a suspect: "The defendant, himself, didn't say anything that would lead anyone to believe that he was even present when the shooting occurred and, therefore, this statement is admissible." (N.T. Volume 1, 11/20/2007, p. 32). Judge Temin stressed that there was nothing about the statement that would lead her to conclude that the statement was involuntary. (N.T. Volume 1, 11/20/2007, p. 32).

After careful examination of all of the facts and circumstances surrounding the Defendant's statement made at the Southwest Detective Division, this court is satisfied that the Defendant made the statement of his free will. Accordingly, the Defendant's Motion to Suppress Statement was properly denied.

31

## EVIDENCE OF THE DECEDENT'S PRIOR SUICIDE ATTEMPT AS A PURPORTED DEFENSE

Finally, the Defendant argues that he is entitled to a new trial as a result of the trial court's ruling, which allegedly precluded his attempt to introduce evidence concerning the decedent's prior suicide attempt. The Defendant claims that the court's ruling deprived him from presenting a defense at trial. Concise Statement of Errors Complained of on Appeal, 11/02/2015, p. 2. The Defendant's claim lacks arguable merit and necessarily fails.

In this Commonwealth, a defendant may offer evidence of a pertinent trait of character of a victim of an alleged crime; in the event such evidence is admitted, the prosecutor may offer evidence to rebut it. Pa.R.E. 404(a)(2)(B)(i). "[A] "pertinent" character trait for purposes of Pa.R.E. 404(a)(2)(i) is limited to a character trait of the victim that is relevant to the crime or defense at issue in the case." *Commonwealth v. Minich*, 2010 PA Super 66, ¶ 26, 4 A.3d 1063, 1072 (2010). When character or a character trait of an alleged victim of a crime is admissible under Pa.R.E. 404(a)(2)(B), the defendant is allowed to use specific instances of conduct to prove the character or character trait. Pa.R.E. 405(b)(2).

Here, outside the hearing of the jury, defense counsel noted that there was a potential defense witness, Dana Harding (a friend of the decedent and the Defendant), who informed defense counsel that approximately three weeks before the fatal shooting, the decedent attempted suicide by slitting her wrists. (N.T. Volume 1, 11/21/2007, p. 14).[12] In an apparent effort to show that the decedent's shooting was an accident, defense counsel voiced his inclination to introduce the evidence at trial. Judge Temin ruled that should the Defendant present the evidence, she would permit the Commonwealth to present evidence with regard to the

---

[12] The defense counsel also noted that "this particular woman took [the decedent] to the University of Pennsylvania Hospital emergency room and had her treated." (N.T. Volume 1, 11/21/2007, p. 14).

contentious relationship between the Defendant and the decedent. (N.T. Volume 1, 11/21/2007, p. 14).

Upon review of the record, this court is satisfied that Judge Temin's ruling was appropriate. While the Defendant was allowed to underscore the decedent's suicidal tendencies as a pertinent character trait and to demonstrate that she, in fact, exhibited prior suicidal behavior, the Commonwealth was entitled to respond with a rebuttal demonstrating the cantankerous nature of the relationship between the decedent and the Defendant. The court's decision, therefore, did not deprive the Defendant from presenting an alleged defense at trial as it would properly have allowed the jury to have a balanced picture of the circumstances surrounding the decedent's death. No relief is due.

## CONCLUSION

In summary, this court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Defendant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

BY THE COURT:

_____

STEVEN R. GEROFF, J.

34